HARRY TROLL, Public Administrator, in charge of Estate of Le Vaunt Howard, Deceased, Respondent, v. UNITED RAILWAYS COMPANY OF ST. LOUIS, Appellant.

St. Louis Court of Appeals, December 31, 1912.

1. **STREET RAILWAYS: Action for Death in Crossing Collision: Contributory Negligence: Presumptions.** In an action for death resulting from a collision at a street crossing between a street car and a vehicle driven by decedent, a verdict should not be directed for defendant on the theory that decedent, in attempting to drive across the track, was guilty of contributory negligence as a matter of law, unless his contributory negligence is affirmatively and conclusively established by the evidence, since the presumption obtains that he exercised due care for his own safety.

2. **TRIAL PRACTICE: Demurrer to Evidence: Rules of Decision.** In determining whether or not the plaintiff has made a prima facie case, the testimony of his respective witnesses should be accepted with reference to one fact and rejected with reference to another, depending upon whether, as to such fact, it is more favorable or less favorable to him than the testimony of his other witnesses.

3. **STREET RAILWAYS: Action for Death in Crossing Collision: Contributory Negligence.** In an action for death resulting from a collision at a street crossing between a street car and a vehicle driven by decedent, *held* that the evidence did not show that decedent failed to look for a car before he drove upon the track; *held*, *further*, that it will be presumed that decedent looked and saw the car, but that, on account of the fact that he saw it at rather an acute angle, he will not be *held* to have ascertained that it was running at a rate in excess of the maximum rate prescribed by ordinance, although others more favorably situated for observation than he was did ascertain that fact; and hence it is *held* that it was not affirmatively and conclusively established by the evidence that decedent was guilty of contributory negligence as a matter of law and, therefore, that the case was properly submitted to the jury.

4. ————: ————: ————: **Presumptions.** A person killed by being struck by a street car is presumed to have looked before going upon the track.

5. ————: ————: ————. A person killed by being struck by a street car, who saw the car approaching and did not know,

and could not have ascertained by the exercise of ordinary care, that it was exceeding the maximum rate prescribed by ordinance, was not guilty of contributory negligence as a matter of law in crossing the track ahead of it.

6. **TRIAL PRACTICE: Demurrer to Evidence: Rules of Decision.** In determining whether or not the plaintiff has made a prima facie case, testimony of his witnesses which is not favorable to a recovery should be disregarded, if it is opposed to the physical facts.

7. **STREET RAILWAYS: Action for Death in Crossing Collision: Excessive Speed: Proximate Cause.** In an action for death resulting from a collision at a street crossing between a street car and a vehicle driven by decedent, evidence *held* to show that decedent could have passed over the track in safety if the car had not been running at a greater rate of speed than that permitted by ordinance, warranting the submission of the case to the jury on the theory that the violation of the ordinance was the proximate cause of the collision.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale,* Judge.

AFFIRMED.

*George T. Priest* for appellant.

(1) The court erred in overruling defendant's demurrer to the evidence, for the reason that the evidence conclusively shows that deceased was guilty of contributory. negligence concurring with that of defendant, in that deceased failed to look and listen for the approach of the car in question, when to look was to see, and to listen was to hear, and in that deceased drove upon the track immediately in front of the car in question and so close thereto as to render a collision unavoidable even though the car had been proceeding at a careful rate of speed. Laun v. Railroad, 216 Mo. 563; King v. Railroad, 211 Mo. 1; McGee v. Railroad, 214 Mo. 530; Holland v. Railroad, 210 Mo. 538; Stotler v. Railroad, 204 Mo. 619; Higgins v. Railroad, 197 Mo. 301; Mockowick v. Railroad, 196 Mo. 550; Sanguinnette v. Railroad, 196 Mo. 466; Boring v.

Railroad, 194 Mo. 541; Green v. Railroad, 192 Mo. 131;
Schmidt v. Railroad, 191 Mo. 215; Roenfeldt v. Rail-
road, 180 Mo. 554; Markowitz v. Railroad, 186 Mo.
530; Reno v. Railroad, 180 Mo.; Reis v. Railroad, 179
Mo. 1; Dey v. Railroad, 140 Mo. App. 461;
Schaub v. Railroad, 133 Mo. App. 444. (2) The
court erred in giving plaintiff's instruction No.
1 for the reason that it was not shown that the
violation of the speed ordinance in question was the
proximate cause of the collision. Schmidt v. Railroad,
140 Mo. 186.

*Ryan & Thompson* and *James C. Campbell* for re-
spondent.

(1) The defendant did not have rights superior
to those of deceased in the use of the streets. Die-
tring v. Transit Co., 109 Mo. App. 524. (2) Defend-
ant having rested its case upon its demurrer to plain-
tiff's evidence, plaintiff is entitled to the benefit of
every inference reasonably deducible from the testi-
mony in his favor. Strauchon v. Railroad, 232 Mo.
587; Kinlen v. Railroad, 216 Mo. 155; Twohey v. Fruin,
96 Mo. 104. (3) The record being void of evidence
to the contrary, it will be conclusively presumed that
deceased exercised reasonable care for his own safety
and that he looked and listened before driving upon
the track. Weller v. Railroad, 164 Mo. 205; Riska v.
Transit Co., 180 Mo. 168; Eckhard v. Transit Co., 190
Mo. 593; Mockowik v. Railroad, 196 Mo. 550; Goff v.
Transit Co., 199 Mo. 695; Powers v. Transit Co., 202
Mo. 267; Priesmeyer v. Transit Co., 102 Mo. App.
522; Rissler v. Transit Co., 113 Mo. App. 120; Carey
v. Street Railway, 125 Mo. App. 188; McMenamy v.
Iron & Steel Co., 144 Mo. App. 714; Railroad v. Lan-
drigan, 191 U. S. 461. (4) It will be presumed that
deceased looked and saw the approaching car, but mis-
judged its speed, or that he looked and saw no car ap-

proaching within a distance making it unsafe to cross. Riska v. Transit Co., 180 Mo. 168; Mockowik v. Railroad, 196 Mo. 550; Eckhard v. Transit Co., 190 Mo. 593; Powers v. Transit Co., 202 Mo. 262; Strauchon v. Street Railway, 232 Mo. 587; Murray v. Transit Co., 108 Mo. App. 506; Meng v. Transit Co., 108 Mo. App. 562; Dietring v. Transit Co., 109 Mo. App. 542; Heintz v. Transit Co., 115 Mo. App. 672. (5) Contributory negligence is generally a question of fact for the jury. It is never a question of law for the court, except where the evidence is substantially all one way and no two opinions can be formed respecting it in the minds of reasonable, fair-minded men of ordinary intelligence. If the facts admit of different inferences in reasonable minds, it must be left to the jury. Powers v. Transit Co., 202 Mo. 267; Eckhard v. Transit Co., 190 Mo. 593; Reed v. Railroad, 107 Mo. App. 246; Meng v. Railroad, 108 Mo. App. 560. (6) Had the car been running at the ordinance speed, deceased would have crossed the track in safety. Strauchon v. Street Railway, 232 Mo. 587; Powers v. Transit Co., 202 Mo. 267; Eckhard v. Transit Co., 190 Mo. 593; Riska v. Transit Co., 180 Mo. 168; Dietring v. Transit Co., 109 Mo. App. 543; Murray v. Transit Co., 108 Mo. App. 506. (7) The collision and resultant death being satisfactorily accounted for by reason of negligence on the part of defendant, the plaintiff is entitled to recover, unless the evidence conclusively establishes contributory negligence on the part of the deceased. Eckhard v. Transit Co., 190 Mo. 593; Weller v. Railroad, 164 Mo. 205.

STATEMENT.—Suit to recover damages for the negligent killing of plaintiff's intestate. Plaintiff had verdict and judgment for $3000, and defendant has appealed.

The assignment of negligence submitted to the jury was the violation of an ordinance which prohib-

ited greater speed than fifteen miles an hour. It is conceded that the evidence established that such violation occurred and defendant offered no evidence at the trial. But defendant makes two contentions, viz., that it conclusively appears from the evidence offered by plaintiff that the decedent was guilty of contributory negligence as matter of law, and that it was not shown that the violation of the speed ordinance was the proximate cause of the injury.

The decedent was killed in a collision between defendant's street car and a wagon on which he was the driver. The collision occurred at the intersection of Olive street and Newstead avenue in the city of St. Louis. Olive street runs east and west and Newstead avenue north and south, crossing each other at right angles. Each of said streets is sixty feet wide from building line to building line and about thirty-four feet, six inches from curb to curb. On the northwest corner—that is, on the west side of Newstead and the north side of Olive—is a large four-story building which extends out flush with the building lines. On the northeast corner—that is, on the east side of Newstead and the north side of Olive—is a vacant lot. Defendant operates a double track street railway line on Olive street, the north track being the west-bound track and the south track being the east-bound track. The wagon was going south along Newstead avenue across Olive street when it was run into by an east-bound car. It was about six o'clock in the afternoon of June 14, 1909, a dry, sunny day.

A Mr. Shaul testified that he was playing ball with his dogs in a vacant lot on the northeast corner, the exact spot where he was standing being twenty-five or thirty feet from the corner where the Olive street and Newstead avenue sidewalks meet; that the decedent, a young colored man, passed by, going south along the east side of Newstead avenue, driving a horse attached to a covered grocery delivery wagon,

the horse going at an ordinary walk; that a west-bound
car was approaching; and the decedent spoke to Shaul,
saying, "Don't let that dog bite me." Shaul was
throwing a ball which the dog would run and catch.
The west-bound car stopped on the west side of New-
stead, let off several passengers, and then proceeded
on its way. That, after the decedent spoke to him, he,
Shaul, went on playing with his dogs, and the next
thing he noticed was the crash of the collision; that he
was not looking in the direction of the wagon at the
time of the collision; that the west-bound car which
stopped at Newstead obstructed his view so that it
he could not see the east-bound car coming. On cross-
examination, Shaul stated that after the west-bound
car moved on he could see; that the first time he saw
the decedent was when the latter was driving along
Newstead avenue south, and at that time the decedent
was about fifteen or twenty feet, maybe a few feet more
or less, north of the north rail of the west-bound track;
that decedent was talking to him then, and he, Shaul,
was east of the decedent; that after decedent spoke to
him, he, Shaul, turned around and tossed his ball to
the dogs and a very short time after that heard the
crash. On redirect examination, Shaul stated that de-
cedent had the lines in his hands and was driving "and
he turns his face to me and spoke to me and drove on."

George Webster, a lawyer, testified that he was
one of those who got off the west-bound car; that after
he left the west-bound car, it proceeded westwardly;
that as he passed behind the car, he looked west to see
if any car was coming east and saw the white mail
car which killed decedent about in front of Sam
Primm's garage (subsequent measurement showed
that the east line of this garage was 329 feet west of
Newstead avenue); that he could tell from the notice
he took of it that the mail car was approaching rapid-
ly; that he went on across the street and stepped up
on the south sidewalk and had taken one step across

the sidewalk when his attention was attracted to the approaching mail car by the noise it made, a noise such as is made by a swiftly moving motor car, and he turned around and in one sweeping glance noted that the front of the mail car was almost opposite him and that the decedent was driving south along the middle of Newstead avenue; that the next moment the car and delivery wagon collided, the air was filled with glass and wood, and decedent was hurled some twenty-three feet to the southeast curb, striking on his head; that the car struck the wagon about the hub of the front wheel, which would be almost under the driver's feet; that the result of the impact was that both shafts were cut off, the horse went south on Newstead and the wagon was caught in the fender of the car and carried on to a point 166 feet east of Newstead avenue, where the car stopped. On cross-examination, Mr. Webster stated that from the time he first saw the east-bound car to the time of the collision he walked fifty-five or sixty feet; that when he first saw the wagon, the horse was just about to step on the north rail of the west-bound track, while the car was almost opposite the witness—the car going about thirty miles an hour, the horse in a slow trot, about six miles an hour; that the wagon and car met almost in the middle of the crossing on the east-bound track; that the east-bound track is a little to the south of the middle of Olive street; that the point of collision was about twenty-eight feet east of where he stood on the sidewalk and about ten feet south of the north rail of the west-bound track; that each track was about five feet wide and the space between the tracks about three feet wide. On redirect examination, he stated that he was not able to tell with any degree of certainty how rapidly the wagon was traveling.

Clifford M. Dolph was also one of those who alighted from the west-bound car. He passed behind it going south and looked west. He saw the mail car

coming east. Being asked if he could tell how rapidly it was traveling, he answered, "Not by sight, no. I know where it was when I saw it first and I know how far I went before I heard the impact and then I heard a terrible· crash." He stated that he had reached the sidewalk and gotten about twenty or twenty-five feet south of the Olive street curb line when he heard the crash.

Fred Berkley got off the west-bound car and walked south with Mr. Dolph. As he started south, he noticed the mail car at about Primm's garage and thinks it was coming at a pretty fair rate of speed. That he had not gone very far, walking south on Newstead, when his attention was attracted to the mail car because of its speed. He says that it was coming about twenty-five miles an hour; that he and Mr. Dolph had gotten about twenty feet south of the south curb on Olive street at the time of the impact; that it was the rumbling and noise of the mail car that attracted his attention; that he turned about the same time the collision occurred, saw the wagon going down the street in front of the car and decedent's body going through the air; that the car was going at the same rate of speed when it struck the wagon as it had been traveling, coming down the block. On cross-examination, he stated that from the point where he first noticed the car to the point where he heard the crash he walked about fifty feet.

J. Chambers, who happened to be on the southeast corner of Newstead and Olive streets, stated that the car was running in the neighborhood of thirty miles an hour.

W. P. Smith, expert, testified that at thirty miles an hour the mail car could have been stopped in ninety feet; at fifteen miles an hour in sixty-five or seventy feet; at ten miles an hour in fifty feet, and at five miles an hour in fifteen feet.

CAULFIELD, J. (after stating the facts).—I. The defendant contends that the trial court erred in overruling its demurrer to the evidence. The theory on which this contention is based is, that the decedent, in attempting to cross the track under the circumstances, was guilty of contributory negligence as matter of law. This theory, in order to avail defendant must be affirmatively and conclusively established by the evidence, for the presumption is that the decedent was in the exercise of ordinary care for his own safety. [Riska v. Union Depot R. R. Co., 180 Mo. 168, 79 S. W. 445.]

Can it be said that there is any such affirmative and conclusive showing? We think not. There is nothing in the case which positively negatives the idea that as he passed the building line into Olive street and thereafter, as due care required, decedent looked for an approaching car. The building line, it may be inferred, was about thirty-four feet north of the point of collision, or say 23½ feet north of the west-bound track. It is true that Shaul testified that decedent was "about fifteen or twenty feet, maybe a few feet more or less," north of the west-bound track when decedent spoke to him, but this testimony, even if it be accepted as true, is vague as to the exact point decedent had reached, and is not positively inconsistent with decedent having looked and seen the approaching car before he turned to speak to Shaul. Or that testimony of Shaul's might have been rejected by the jury altogether, for he also testified that, when decedent spoke to him, he, Shaul, was twenty-five or thirty feet north of the Olive street sidewalk, and he says that he was then east of the decedent. It well may be inferred from this that, after the decedent spoke to Shaul and had driven on, he still had twenty-five or thirty feet to go before reaching the north building line of Olive street, and of course might well have looked for an approaching car when he did reach that building line. This seems

more reasonable than to place the decedent only fifteen to twenty feet north of the north rail, or 32½ to 37½ feet south of where Shaul stood, so that to speak to Shaul he must have had to lean his head out of the wagon and look around backward—a proceeding which would have been sufficiently extraordinary to have caused Shaul to mention it in his testimony if it had occurred. Shaul did not mention such a thing, but merely states that "he (the decedent) had the lines in his hands and was driving and he turns his face to me and spoke to me and drove on."

Shaul's testimony, however, that the horse was going at an ordinary walk, may well have been accepted by the jury instead of Webster's testimony that it was going six miles, for the latter disclaims any approach to certainty in that respect and was not in a position to judge accurately. Assuming that the ordinary walk of a horse is four miles an hour, decedent was going 5-13/15 feet per second and it would have taken him 5-35/44 seconds to go from the building line to the point of collision, during which time the car, traveling thirty miles an hour or forty-four feet per second, must have traveled 255 feet, so that at the moment the decedent passed the building line into Olive street, if he looked—and the law presumes that he did (Powers v. Transit Co., 202 Mo. 267, 100 S. W. 655; Riska v. Union Depot R. R. Co., supra )—he must have seen that the car was 255 feet, nearly a block, away. If the car had not been running in excess of fifteen miles per hour in violation of the ordinance— and decedent had a right to assume that it was not (Powers v. Transit Co., supra; Deitring v. St. Louis Transit Co., 109 Mo. App. 524, 85 S. W. 140; Riska v. Union Depot R. R. Co., supra)—it would have taken it at least 11½ seconds to reach the point of collision. During that time, decedent could have traveled at least sixty-seven feet and arrived in ample time at a perfectly safe place, well beyond the east-bound track.

Under these circumstances, if decedent did not know, or in the exercise of ordinary care could not have known, that the car was approaching at a rate of speed in excess of the ordinance rate, he was not guilty of negligence as matter of law in proceeding to cross the street. [Powers v. Transit Co., supra; Riska v. Union Depot R. R. Co., supra.]

We do not feel justified in holding that the decedent was guilty of contributory negligence as matter of law in not recognizing the excessive speed of the car, though others did, he being compelled to view the approaching car from a rather acute angle, and being very probably prevented, by being in a covered wagon, from hearing the noise which first indicated to the others the excessive speed of the car. The others also saw the car as it passed them or immediately thereafter, an advantage the decedent did not have in time to avail of it. [See Strauchon v. Metropolitan St. R. R. Co., 232 Mo. 587, 135 S. W. 14; Deitring v. St. Louis Transit Co., supra.]

It may be reasoned with the same result if it be assumed that due care required decedent to look as his horse's head was even with the north rail of the west-bound track, or to look at what was probably the last moment before his horse stepped into the danger zone, viz., when the horse's head had reached the south rail of the west-bound track. When the horse's head was at the north rail of the west-bound track, the front hub, say twelve feet back, must have been about twenty-two feet from the point of collision. The car must then have been 165 feet west. If it had been running at the ordinance speed it would have taken it at least about 7½ seconds to reach the point of collision, during which time the wagon, going four miles an hour could have traveled forty-four feet, so that the hind end of the wagon would have been twelve feet beyond the danger zone before the car, observing the ordinance, would have reached the point of collision. When

the horse's head was at the south rail of the west-bound track, the front hub must have been seventeen feet from the point of collision and the car 127½ feet west. At the ordinance speed, the car would have taken 5.79 seconds to reach the point of collision, during which time the wagon could have traveled nearly thirty-four feet, so that the hind end of the wagon would have been about seven feet beyond the danger zone before the car, observing the ordinance, would have reached the point of collision. The testimony of Mr. Webster, to the effect "that when the car was but twenty-eight feet away from the point of collision" the head of the horse was north of the north rail of the west-bound track, ten feet from the point of collision, might well have been rejected by the jury, for, if such were the relative positions of the car and horse, it would have been impossible for the collision to have occurred as it did, the car going thirty miles an hour and the horse going four or six miles an hour. The horse would never have gotten even his head in front of the approaching car. The arguments based upon the supposed conclusiveness of that testimony need not be considered. This discrepancy in the testimony may be accounted for by the fact that Mr. Webster had but a fleeting glance at a very rapidly moving panorama.

II. The defendant's contention that the court erred in giving plaintiff's instruction No. 1 must be overruled. The only basis for this contention is the assertion that there was no evidence to support the hypothesis, embodied in the instruction, that the violation of the speed ordinance was the proximate cause of the injury. That assertion is erroneous, because, as we have seen, the fact appears that if the ordinance had been obeyed the wagon would have cleared the track. [See Stotler v. Railroad, 200 Mo. 107, l. c. 136, 98 S. W. 509; Strauchon v. Met. St. Ry. Co., 232 Mo.

587, l. c. 596, 7, 135 S. W. 14; Niehaus, Admr., v. Railroad, 165 Mo. App. 606, l. c. 614.]

The judgment is affirmed. *Reynolds, P. J.,* and *Nortoni, J.,* concur.